## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**JOSEPH HIGGINS,**
**LESLIE GARCIA,**
**JOSE URBAN,**

       **Plaintiffs,**                     **Case No. 11 CV 757 JAP/ACT**

**vs.**

**CHARLES BACA, and**
**CITY OF SANTA ROSA,**

       **Defendants.**

## MEMORANDUM OPINION AND ORDER

Officer Charles Baca (Officer Baca) and the City of Santa Rosa, New Mexico (Defendants) ask the Court to dismiss claims asserted by Joseph Higgins (Higgins), Leslie Garcia (Garcia), and Jose Urban (Urban) (together, Plaintiffs).[1] *See* PLAINTIFFS' FIRST AMENDED COMPLAINT FOR RECOVERY OF DAMAGES DUE TO DEPRIVATION OF CIVIL RIGHTS AND VIOLATION OF TORT CLAIMS ACT (Doc. No. 1-3) (Complaint) filed on August 24, 2011.  Under 42 U.S.C. § 1983, Plaintiffs allege that Officer Baca violated their Fourth Amendment rights by arresting Plaintiffs without probable cause.  Plaintiffs also assert

---

[1] On May 31, 2012, Defendants filed DEFENDANTS CHARLES BACA'S AND CITY OF SANTA ROSA'S MOTION TO DISMISS COMPLAINT BASED ON QUALIFIED IMMUNITY AND AS A MATTER OF LAW BASED ON THE UNDISPUTED MATERIAL FACTS (Doc. No. 39) (Motion). The Court has also considered PLAINTIFFS' RESPONSE TO DEFENDANTS CHARLES BACA'S AND CITY OF SANTA ROSA'S MOTION TO DISMISS COMPLAINT BASED ON QUALIFIED IMMUNITY AND AS A MATTER OF LAW BASED ON THE UNDISPUTED MATERIAL FACTS (Response) (Doc. No. 42), and DEFENDANTS REPLY IN SUPPORT OF THEIR MOTION TO DISMISS COMPLAINT BASED ON QUALIFIED IMMUNITY AND AS A MATTER OF LAW BASED ON THE UNDISPUTED FACTS (Doc. No. 44) (Reply).

1

claims against Officer Baca under the New Mexico Tort Claims Act (NMTCA) NMSA 1978 §§ 41-1-12 for violations of their New Mexico constitutional rights.[2]  The Court will grant the Motion and dismiss the § 1983 claims because Officer Baca is entitled to qualified immunity from the Count I claims.  The Court will remand the remaining state law claims to state court.

I.  Standard of Review

A.  Summary Judgment

Since Plaintiffs and Defendants have presented evidence outside of the pleadings in support of the Motion and the Response, the Court will treat the Motion as a request for summary judgment on the issue of qualified immunity. *See* Fed. R. Civ. P. 12(d) (stating that if matters outside the pleadings are presented to and not excluded by the court, "the motion must be treated as one for summary judgment under Rule 56.").  Summary judgment is appropriate if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

---

[2] In Count II of the Complaint, Plaintiffs asserted claims against Officer Baca under 42 U.S.C. § 1983 alleging violations of their due process rights to be free from outrageous actions resulting in deprivations of their liberty.  In Count III of the Complaint, Plaintiffs assert claims against the City of Santa Rosa for failing to sufficiently monitor Officer Baca's investigations and Officer Baca's use of confidential informants.  Count III also alleges that the City of Santa Rosa maintained a policy of inadequate investigation and inadequate corroboration of allegations of criminal wrongdoing, especially regarding the execution of arrest warrants.  The claims against the City have been dismissed.  Plaintiffs concede that dismissal of Count II is appropriate, and the Court will dismiss Count II with prejudice.

### B. Qualified Immunity

When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citing *Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir.2000); *Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir.1995)). The plaintiff must satisfy a "heavy two-part burden." *Id.* (citations omitted). The plaintiff must first establish "that the defendant's actions violated a constitutional or statutory right." *Id. Albright v. Rodriquez*, 51 F.3d 1531, 1534 (10th Cir. 1995); *see also Wilson v. Layne*, 526 U.S. 603, 609 (1999) (noting the court must first decide whether the plaintiff has alleged deprivation of a constitutional right). If the plaintiff establishes a violation of a constitutional right, the plaintiff must then demonstrate that the right was clearly established at the time of the defendant's unlawful conduct. *Medina*, 252 F.3d at 1128. If the plaintiff fails to satisfy its two-part burden, the court must grant the defendant qualified immunity. *Id.* If the plaintiff establishes both elements of the qualified immunity test, then the court may grant summary judgment if the defendant shows "'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quoting *Albright*, 51 F.3d at 1535).

### II. Background

In May 2010, Plaintiffs, along with at least twenty other residents of Santa Rosa, New Mexico, were arrested for selling illegal drugs. The arrests were made as a result of an undercover investigation by the Santa Rosa Police Department in conjunction with the New Mexico Region V Task Force. (Compl. ¶¶ 4-7.) Officer Baca of the Santa Rosa Police Department used a confidential informant (CI) to make controlled purchases of narcotics from suspected drug dealers. However, the CI was unable or unwilling to testify and all charges

3

against the Plaintiffs were dismissed. (Compl. ¶¶ 9, 12.)  Plaintiffs claim they were arrested

without probable cause in violation of their rights under the Fourth Amendment and the under

New Mexico Constitution to be free from unreasonable seizure.  Plaintiffs deny selling drugs and

allege that Officer Baca submitted false affidavits describing undercover drug transactions

between Plaintiffs and the CI that Officer Baca allegedly observed.  Plaintiffs claim that the

arrest warrants were issued without probable cause based on Officer Baca's false affidavits.

A.  The Investigation and Arrest of Joseph Higgins

On May 21, 2010, Higgins was arrested under an arrest warrant issued by the magistrate

court of Guadalupe County, New Mexico.  The arrest warrant was issued in reliance on Officer

Baca's AFFIDAVIT FOR ARREST WARRANT (Warrant Affidavit for Higgins) (Mot. Ex. A),

in which Officer Baca described two undercover drug purchases between Higgins and the CI.

(*Id.* at 1.)[3]  In his Warrant Affidavit for Higgins, Officer Baca stated that the CI was "reliable

and creditable."  (*Id.*)  Officer Baca testified that the CI had provided to law enforcement a list of

names of people who were suspected of selling or distributing drugs.

---

[3] In answers to interrogatories in this case, Officer Baca stated that he had used the CI
approximately nineteen times before May 21, 2010 and that Officer Baca was aware that State
Police officers had used the CI before that date.  *See* Defendants' Answers and Objections to
Plaintiffs' First Set of Interrogatories, No. 14 (Mot. Ex. B).  However, this information was not
included in the Warrant Affidavit for Higgins.

4

(Transcript of Proceedings *In Camera* on August 31, 2012  (Doc. No. 53) at 17:1-25.)[4]  Prior to

the undercover purchases, Officer Baca used the CI to successfully complete two "cred buys" to

establish the CI's credibility. (*Id.*)

### 1.  First Undercover Drug Purchase

On March 21, 2010 at approximately 7:10 p.m., Officer Baca met with the CI.  The CI

told Officer Baca that he thought he could buy a "BB" of heroin and some pills from Higgins for

$60.00 and that Higgins was at his wife's apartment located at #25 Cinnamon Ridge

Apartments.[5] (Warrant Affidavit for Higgins at 1.)  Officer Baca and the CI then planned a

"surveyed buy of heroin." (*Id.*)  First, Officer Baca searched the CI and removed all items from

the CI's person. (*Id.* at 2.)  Officer Baca gave the CI three twenty dollar bills and told the CI to

put the money into the seam area of the baseball cap the CI was wearing. (*Id.*)  Officer Baca

explained to the CI that he would be following him and would maintain "constant visual." (*Id.*)

Officer Baca instructed the CI that after making the drug purchase, the CI was to walk away

from the apartment and keep his hands in plain view until Officer Baca again made contact with

him. (*Id.*)  The CI walked up to apartment # 25, and Officer Baca watched the CI enter the

apartment through the front door. (*Id.*)

---

[4] In PLAINTIFFS' MOTION TO COMPEL (Doc. No. 34), Plaintiffs asked Defendants to produce the confidential informant file, the identity of the CI, the CI's arrest record, and the CI's full criminal history.  Defendants objected to the requests. Magistrate Judge Alan C.  Torgerson overruled Defendants' objections; however, Magistrate Judge Torgerson established a procedure to protect the CI's identity. The Defendants were ordered to produce the CI and Officer Baca for an *in camera* hearing.  Plaintiffs and Plaintiffs' counsel were not allowed to attend the *in camera* hearing but were allowed to submit written questions for the CI and Officer Baca to answer. *See* MEMORANDUM OPINION AND ORDER (Doc. No. 49).  The transcript of the *in camera* hearing is part of the record.

[5] At the time, Higgins' wife was Plaintiff Leslie Garcia.

(a) Officer Baca's alleged observations through a sliding glass door of the  apartment

Officer Baca testified that after the CI went into the apartment, Officer Baca "immediately made [his] way to the back side of the apartment where there was a sliding door," and through the sliding glass door, "[Officer Baca] observed CI speak with a male subject, who from past encounters, [Officer Baca] knew to be Joseph Higgins."  (*Id.* at 2.)  Officer Baca then described the alleged drug purchase:

> [I] watched as CI, recovered the money from the cap seam area.  Also observed Higgins entering the kitchen area, and reaching up to open a cabinet. Higgins pulled down a white bowl with yellow and red flowers wrapping around the bowl. He held the bowl and pulled out an object and handed it to CI. CI handed the money to Higgins. CI exited the apartment through the door in which CI gained access.

(*Id.*)

(b) Officer Baca's meeting with the CI

Officer Baca testified that after the CI exited the apartment,

> CI walked towards Route 66 with hands in plain view and continued walking as [Officer Baca] following [sic] behind on foot maintaining visual. [Officer Baca] stopped CI on Route 66 behind a building. There [Officer Baca] directed CI to hand over the item CI had in right hand. The item handed over was a black tar like substance wrapped in a blue plastic wrapping in BB size. CI and [Officer Baca] returned back to the designated secure area. Once at this area, CI . . . . then passed [Officer Baca] the change of . . . a twenty-dollar bill. [Officer Baca] searched CI again and ensured that there were no items as well as no money on CI's person. The black tar substance was tested using Mecke's (Modified) 24 a test for Heroin. The result of the test was positive giving a light green color.  The BB of Heroin was bagged into evidence.

(*Id.*)

2.  Second Undercover Drug Purchase

On March 22, 2010 at approximately 8:20 p.m., Officer Baca made contact with the CI at a secure designated area. (*Id.*)  "CI stated that they [sic] would be able to purchase forty dollars ($40.00) worth of Cocaine and twenty dollars ($20.00) worth of pills. CI stated that Higgins was

selling out of his wife [sic] apartment, (Leslie Garcia), in apartment #25 located at the Cinnamon

Ridge Apartments." (*Id.*)  Officer Baca then searched the CI, removed all items from the CI's

possession, gave the CI three twenty dollar bills, and directed the CI to place the money into the

seam area of his baseball cap. (*Id.*)  Officer Baca told the CI that Officer Baca would maintain

constant visual of the CI's movements and instructed the CI to keep his hands in plain view after

the drug purchase until Officer Baca could meet with the CI outside the apartment. (*Id.*)  The CI

walked to the Cinnamon Ridge Apartments, while Officer Baca maintained "constant visual."

(*Id.* at 3.)

> (a) Officer Baca's alleged observations through the sliding glass
> door

The CI entered apartment #25 through the front door on the east side of the apartment,

and Officer Baca immediately went around to the west side of the apartment to observe through

the sliding glass door, as Officer Baca said he had done the prior evening. (*Id.*)  Officer Baca

testified,

> [I] watched as CI recovered the money from the cap seam area. Also observed was
> Higgins entering the dining room area, retrieving a clear plastic baggie containing a
> white substance. Higgins weighed it out on a scale and wrapped it in a clear plastic
> baggie. CI handed the money to Higgins. CI exited the apartment through the door in
> which CI gained access.

(*Id.*)

> (b) Officer Baca's meeting with CI

Officer Baca watched the CI walk toward Route 66 with "hands in plain view," Officer

Baca stopped the CI behind a building and directed the CI to "hand over the item CI had in right

hand." (*Id.*) "The item handed over was a clear baggie containing a white salt like substance."

(*Id.*)  The CI then informed Officer Baca that the CI could not get the pills, but was able to get a

7

"sixty of Cocaine." (*Id.*) Officer Baca searched the CI again and ensured that there were "no items as well as no money on CI's person." (*Id.*)  The substance in the baggie tested positive for Cocaine and was placed into evidence.  (*Id.*)

On May 21, 2010, the magistrate court for Guadalupe County issued an arrest warrant for Higgins based on Officer Baca's Warrant Affidavit for Higgins, and Higgins was arrested on the same day. *See* WARRANT FOR ARREST (Mot. Ex. C).

### 3.  Higgins' Affidavit

Higgins submitted an affidavit with Plaintiffs' Response to the Motion.  *See* AFFIDAVIT OF JOSEPH HIGGINS Doc. No. 47, Ex. A (Higgins Affidavit).[6]  Higgins testified that it was not physically possible for Officer Baca to get to the back side of Apartment #25 as fast as Officer Baca described in his Warrant Affidavit for Higgins because Officer Baca would have had to go around two other apartments before he could reach the back of Apartment #25. (Higgins Aff. ¶ 3.)  According to Higgins, "[i]t is not possible that Defendant Officer Baca switched his position from my front door to my back door in such a quick fashion to witness events as seamlessly as he alleges." (*Id.* ¶ 4.)  Higgins stated that at the time of the alleged drug sales, a seven to eight-foot wooden fence surrounded the backyard of the apartment, and "[t]he wooden fence . . . [did] not have a gate." (*Id.* ¶¶ 5- 6.)  Higgins testified that Officer Baca "couldn't have possibly witnessed any of the actions taking place in my apartment. . . . in March

---

[6] In the Response, Plaintiffs submitted an affidavit from Higgins, but the affidavit was not signed.  On July 11, 2012, Plaintiff filed PLAINTIFFS' SUPPLEMENTAL EXHIBIT IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS CHARLES BACA AND CITY OF SANTA ROSA'S MOTION TO DISMISS [Doc. #42] (Doc. No. 47), with an identical signed and notarized affidavit. Even though the Supplemental Exhibit was filed after the deadline for the Response, the Court, in the interest of fairness, has considered the Supplemental Affidavit as Exhibit A to the Motion.

of 2010, my wife and I had a blanket strung across our sliding glass window to serve as a

curtain." (*Id.* ¶¶ 7-8.)  In addition, "[t]he kitchen cabinets that Defendant Baca alleges he saw me

pull heroin out [sic] are on the same wall as the sliding glass door.  The cabinets are not visible

from the outside [sic] the sliding glass due to the flat angle.  It is not possible that . . .  Defendant

Baca witnessed me pull anything out of my kitchen cabinet, even if there were no blankets." (*Id.*

¶ 10.)  Higgins also denied  owning a white bowl with yellow and red flowers on it, and Higgins

denied he ever sold illegal drugs.  (*Id.* ¶¶ 11-14.)

### 4.   No information is available from the CI

There is no information from the CI regarding the events that led to Plaintiffs' arrests.  In

Plaintiffs' initial interrogatories and in PLAINTIFFS' MOTION TO COMPEL (Doc. No. 34),

Plaintiffs asked Defendants to produce the confidential informant file, the identity of the CI, the

CI's arrest record, and the CI's full criminal history.  Defendants objected to the requests

because revealing the identity of the CI would jeopardize the CI's safety.  Magistrate Judge Alan

C.  Torgerson overruled Defendants' objections; however, Magistrate Judge Torgerson

established a procedure to protect the CI's identity.  *See* MEMORANDUM OPINION AND

ORDER (Doc. No. 49).  Magistrate Judge Torgerson ordered that Defendants produce the CI and

Officer Baca for an *in camera* hearing, which Plaintiffs and Plaintiffs' counsel were not allowed

to attend.  However, Magistrate Judge Torgerson  allowed Plaintiffs to submit written questions

for the CI to answer.  Defendants' counsel were allowed to appear at the hearing.  The record of

the hearing was to be sealed.  (*See* Transcript of Proceedings *In Camera* held on August 31,

2012 (Doc. No. 53)).

Officer Baca appeared at the *in camera* hearing, but the CI did not appear.  Defendants'

counsel explained that the CI had told counsel a few days before the hearing that he was not

willing to appear.  Defendants' counsel also reported that the evening prior to the hearing, the Santa Rosa Police had arrested the CI for a probation violation.  Plaintiffs assert that the CI's "convenient" arrest by the Santa Rosa Police Department shows that the CI's testimony would be unfavorable to Defendants.

At the *in camera* hearing Officer Baca testified that the operational plan was prepared in conjunction with his sergeant, Chris Baca (no relation), who according to Officer Baca recommended the CI.  (Tr. 18: 21; 20: 11-13.).  Officer Baca described the vetting process for the CI in which he gained information from others in the New Mexico law enforcement community. (*Id.* 20:11-21:19.)  Officer Baca testified that the CI wrote on a list about 60 names of individuals in Santa Rosa who were selling illegal drugs.  (Tr. 17:1-25.)  Officer Baca's testimony at the *in camera* hearing also revealed sources of information, other then the CI, that the Plaintiffs could use to investigate Officer Baca's credibility "in planning, investigating and executing the underlying search/arrest warrants at issue in this case." MEMORANDUM OPINION AND ORDER (Doc. No. 71) at 18.  Thus, Magistrate Judge Torgerson denied in part and granted in part PLAINTIFFS' SECOND MOTION TO COMPEL CONFIDENTIAL INFORMANT INFORMATION (Doc. No. 56).  Magistrate Judge Torgerson ordered Defendants to produce several documents that could be redacted to protect confidential information, including: 1) the list of possible drug sellers prepared by the CI redacted only to show Plaintiffs' names, if listed; 2) the operational plan prepared for the Region V Task Force for the initiative in March 2010 in Santa Rosa; 3) all reports from other law enforcement agencies that Officer Baca used in choosing the CI for this initiative; and 4) the CI's file, excluding his arrest records, redacted to protect the CI's identity.  Magistrate Judge Torgerson denied Plaintiffs' request for the CI's name, personal information, and the CI's arrest record as

privileged.  (*Id.*)

5.  Officer Baca's *In Camera* Testimony

Officer Baca's *in camera* testimony differed somewhat from his Warrant Affidavit for

Higgins.  Officer Baca testified that he observed both transactions in Higgins' apartment through

the slats of the fence located behind the apartment. (Tr. 38:17-25.)  Officer Baca testified:

> The east side of the  apartment has a big, large window. That window was always
> covered up. But in the rear of the apartment , there are - - there is somewhat of a porch,
> and it is maybe eight by eight, maybe, and it is covered or surrounded by a wood fence.
> So after he made entrance into the home, I went to the back side to view the actual
> transaction taking place.
> . . .
> So at that point, I quickly, because I didn't want him being out of my sight more than
> what he had to, made my way to the other side of the apartment where I was able to
> actually look into the sliding window or sliding door, I should say, through those wood
> slats, where I then observed the Defendant Higgins pull a white bowl of some sort with a
> flowery design around it and pull an object out of that bowl and hand it to CI, where CI
> then took the money out of the designated area and made the transaction.

(Tr. 38:6-39:2.)

Officer Baca did not mention the fence and the blanket covering the front window in the

Warrant Affidavit for Higgins.  In addition, Higgins' Affidavit contradicts both Officer Baca's *in*

*camera* testimony and Officer Baca's Warrant Affidavit for Higgins.  Higgins testified that the

sliding glass door at the back of the apartment was covered by a blanket, and that the porch area

outside the back door was enclosed by a fence.  Higgins also stated that the cabinet from which

Higgins' allegedly obtained the bowl containing drugs was flush with the wall beside the sliding

glass door, which would prevent a person from observing the events that Officer Baca claims he

observed.

B.  The Investigation and Arrest of Leslie Garcia.

On May 21, 2010, Garcia was arrested based on an arrest warrant issued by the

11

magistrate court of Guadalupe County, New Mexico.  The arrest warrant was based on Officer

Baca's AFFIDAVIT FOR ARREST WARRANT (Mot. Ex. E.) (Warrant Affidavit for  Garcia),

in which Officer Baca described two undercover drug purchases between the CI and  Garcia.

(*Id.*)

### 1.  First Undercover Drug Purchase

On March 30, 2010 at approximately 9:25 p.m., Officer Baca met with the CI at a

designated location. (*Id.*)  Officer Baca first searched the CI and removed all items from his

person, and the CI was allowed to have only two twenty-dollar bills in his possession. (*Id.* at 2.)

Officer Baca then directed the CI to place the money into the seam of the CI's baseball cap.  (*Id.*)

Officer Baca told the CI that Officer Baca would maintain constant visual, and Officer Baca

instructed the CI that after the drug purchase, the CI was to keep his hands in view until Officer

Baca was able to join the CI. (*Id.*)

The CI walked to the Cinnamon Ridge Apartments as Officer Baca followed. (*Id.*)

Officer Baca observed the CI walk up to Garcia's residence, #25 Cinnamon Ridge Apartments.

(*Id.*)  Officer Baca stated that he saw Garcia leave the apartment on the east side. (*Id.*)  Officer

Baca went into the east side of the laundry room, which was located just southeast of Garcia's

apartment. (*Id.*)  Officer Baca watched the CI recover the money from his baseball cap, then saw

Garcia hand over an item to the CI's right hand and the CI hand money to Garcia. (*Id.*)  The CI

then began walking toward Route 66 with his hands in plain view, and Officer Baca followed the

CI maintaining visual contact. (*Id.*)  Officer Baca stopped the CI behind a building and directed

the CI to hand over the item in his right hand. (*Id.*)  The CI handed Officer Baca a baggie

containing a white salt-like substance. (*Id.*)  Officer Baca and the CI returned to the secure area

and tested the substance, which tested positive for Cocaine, and the baggie was placed into

12

evidence. (*Id.*)

### 2.  Second Undercover Drug Purchase

On May 8, 2010 at approximately 9:25 p.m., Officer Baca met the CI at a secure

designated area.  (*Id.*)  Officer Baca and the CI planned to purchase methamphetamine from

Garcia at her newly-rented house on Capitan Road in Santa Rosa. (*Id.*)  Officer Baca first

searched the CI and removed all items from the CI's person. (*Id.*)  Officer Baca gave the CI two

twenty dollar bills, and directed the CI to place the money into his baseball cap.  (*Id.*)  Officer

Baca explained to the CI that Officer Baca would follow him and maintain a constant visual.

(*Id.*)  Officer Baca instructed the CI to keep his hands in plain view after the purchase until

Officer Baca contacted him. (*Id.*)

The CI walked south on South 4th Street toward Capitan Road, and Officer Baca

followed the CI at a distance. (*Id.*)  The CI walked up to Garcia's residence on Capitan Street.

Officer Baca observed Garcia step out of the residence through the only door on the south side of

the residence, and saw Garcia and the CI go into the alley. (*Id.* at 3.)  The CI spoke to Garcia and

recovered the money from his cap. (*Id.*)  Garcia put an item into the CI's right hand, and the CI

handed Garcia the money. (*Id.*)  The CI turned and walked toward the alley between South 5th

Street and South 6th Street keeping his hands in plain view. (*Id.*)  In the alley, Officer Baca met

the CI and directed the CI to hand over the item in his right hand. (*Id.*)  The item was a white

salt-like substance wrapped in a clear plastic baggie. (*Id.*)  The CI and Officer Baca returned to

the secured designated area, Officer Baca tested the white salt-like substance, which tested

positive for methamphetamine, and the substance was bagged into evidence. (*Id.*)

### 3.  Garcia's Affidavit

Plaintiffs submitted an AFFIDAVIT OF LESLIE GARCIA (Garcia Affidavit) attached to

the Response as Exhibit 3.[7]  In the affidavit, Garcia testified, "I have never engaged in hand-to-hand drug sales." (*Id.* ¶ 2.)  Garcia further testified "I did not take part in a drug sale on May 8, 2010 at my residence, 549 Capitan Ave Santa Rosa, NM 88435. (*Id.* ¶ 3.) These were the only evidentiary statements in the Garcia Affidavit.

### C.  The Investigation of Jose Urban

On May 21, 2010, Jose Urban (Urban) was arrested based on an arrest warrant issued by the magistrate court of Guadalupe County, New Mexico.  The arrest warrant was based on Officer Baca's AFFIDAVIT FOR ARREST WARRANT (Mot. Ex. H.) (Warrant Affidavit for Urban), in which Officer Baca described one undercover drug purchase.

#### 1.  Undercover Drug Purchase

On May 3, 2010 at approximately 9:00 p.m., Officer Baca met the CI at a secure designated area. (*Id.* at 1.)  The CI informed Officer Baca that Urban was selling methamphetamine out of his house located at 701 South 4th Street in Santa Rosa. (*Id.*)  Officer Baca searched the CI and removed all items from the CI's person. (*Id.*)  Officer Baca gave the CI one twenty dollar bill and directed the CI to put the money into his baseball cap. (*Id.*)  Officer Baca told the CI that Officer Baca would be following him and would maintain a constant visual. (*Id.* at 2.)  Officer Baca told the CI to keep his hands in plain view after the drug purchase. (*Id.*)  The CI walked south down the alley between South 4th Street and South 5th Street toward Casaus Street, and Officer Baca followed the CI at a distance. (*Id.*)  The CI walked up to the residence, and Urban opened the door located on the north side of the residence. (*Id.*)  Officer

---

[7] Similar to Higgins Affidavit, the original Exhibit 3 affidavit of Garcia was unsigned. On July 10, 2012, Plaintiffs filed a signed and notarized AFFIDAVIT OF LESLIE GARCIA.  In the interest of fairness, the Court will consider the supplemental affidavit (Doc. No. 46-1) as Exhibit 3 to the Response.

Baca "made [his] way to the west side of the residence where there were three vehicles located."
(*Id.*)   "While surveying from the viewpoint, [Officer Baca] observed CI speak with a male
subject, who from past encounters, [Officer Baca] knew to be Jose R. Urban." (*Id.*)  Officer Baca
observed that the CI remained standing "in the doorway to the residence and did not enter." (*Id.*)
Officer Baca observed the CI recover the money from his cap and give the money to Urban. (*Id.*)
Urban then exited the residence and walked toward an older model copper pick up truck with
NM license plate VF 1800. (*Id.*)  This vehicle was sitting with two other vehicles on the west
side of the residence. (*Id.*)  Urban walked to the bed of the truck and opened the white tool box,
Urban handed the CI an item, and the CI held the item in his right hand. (*Id.*)  The CI left the
residence and walked north through the alley between South 3rd Street and South 4th Street
toward Baca Street with his hands in plain view. (*Id.*)  Officer Baca followed the CI and stopped
the CI behind another residence. (*Id.*)  The CI handed Officer Baca the item in his right hand, a
plastic  baggie containing a white rock-like substance. (*Id.*)  The CI and Officer Baca returned to
the designated secure area where Officer Baca searched the CI again and determined that CI had
nothing in his possession. (*Id.*)  The substance tested positive for methamphetamine and was
bagged into evidence. (*Id.*)

### 2.  Urban's Affidavit

Plaintiffs have submitted the AFFIDAVIT OF JOSE URBAN attached to the Response
as Exhibit 2 (Urban Affidavit).[8]  Urban testified that he "never engaged in hand-to-hand drug
sales." (*Id.* ¶ 1.)  Urban testified that he "did not take part in a drug sale on May 3, 2010 at my

---

[8] The original Urban Affidavit was unsigned.  On July 9, 2012, Plaintiffs filed a signed
and notarized AFFIDAVIT OF JOSE URBAN (Doc. no. 43-1), which the Court will consider as
Exhibit 2 to the Response.

residence, 701 South 4th St. Santa Rosa, NM 88435." (*Id.* ¶ 2.)  In addition Urban stated, "I have

no idea why Charles Baca would falsely charge me, however, Baca had previously arrested me

and charged me with DWI. The charges against me were dismissed."  (*Id.* ¶ 3.)  Urban testified,

"Baca claims to have walked from the north side of my house over to the west side. If he had

done that, I would have noticed him even at night."  (*Id.* ¶ 9.)  Urban concluded, "Baca alleges I

went to my truck to retrieve drugs while he was standing literally a few feet from where I park

my trucks.  If I were selling drugs from my truck in the open, I would have carefully looked

around.  If I were selling drugs, I would have seen [Officer Baca]." (*Id.* ¶ 10.)  Urban attached

pictures showing "the area [Officer] Baca claims to have walked to witness, at night, the alleged

drug sale from my house." (*See* Resp. Exs. 2a-2f.)

Urban contends Officer Baca's description of Officer Baca's location where Officer Baca

claims he observed the alleged drug buy is implausible and therefore false.  In other words,

Urban claims that no undercover purchase happened because Officer Baca's description of his

movements and his location during the transaction would have made Officer Baca visible to

Urban.  Urban testified that if he had seen Officer Baca standing near his house, he would not

have sold drugs.

III.  Discussion

A.  Count I Claim Under 42 U.S.C. § 1983

Section 1983 claims for wrongful arrest are analyzed under the analogous tort of

malicious prosecution; however, the ultimate and indispensable element of the claim is the

deprivation of a constitutional right. *Grubbs v. Bailes*, 445 F.3d 1275, 1278 (10th Cir. 2006)

(citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1285-90 (10th Cir. 2004).  In this case, "that

constitutional right is the Fourth Amendment's right to be free from unreasonable seizures." *Id.*

16

(quoting *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996)).  An arrest without sufficient probable cause is a violation of the Fourth Amendment. *Taylor*, 82 F.3d at 1561.

To prove a malicious prosecution claim based on an arrest warrant, a plaintiff must show 1) that the defendant caused the plaintiff's confinement; 2) that the charges terminated in the plaintiff's favor; 3) that there was no probable cause to arrest the plaintiff; 4) malice; and 5) damages. *Wilkins v. DeReyes*, 528 F.3d 790, 799 n. 5 (10th Cir. 2008).  However, the Tenth Circuit Court of Appeals stated, "our circuit takes the common law elements . . . as the 'starting point' for the analysis of a § 1983 malicious prosecution claim, but always reaches the ultimate question, which it must, of whether the plaintiff has proven a constitutional violation." *Taylor*, 82 F.3d at 1560-61.

Plaintiffs allege that Officer Baca violated their Fourth Amendment rights when he submitted affidavits to the magistrate court that he knew were false and caused the magistrate court to issue arrest warrants without probable cause.  Plaintiffs claim that Officer Baca fabricated all of the allegations against them.  Under clearly established Supreme Court precedent, if Officer Baca "knowingly, or with reckless disregard for the truth," included false statements in the affidavits and those statements contained facts that were necessary to a finding of probable cause, Officer Baca violated Plaintiffs' Fourth Amendment rights. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

A magistrate judge may issue an arrest warrant only if he makes an informed, deliberate, and independent determination of probable cause based upon sufficient details contained in an affidavit submitted to obtain the warrant.  An affidavit submitted in support of a warrant "must provide the magistrate with a substantial basis for determining the existence of probable cause. . . ." *Illinois v. Gates*, 462 U.S. 213, 239 (1983).  "In order to ensure that such an abdication of the

17

magistrate's duty does not occur, courts must . . . conscientiously review the sufficiency of affidavits on which warrants are issued." *Id.*  For a valid warrant to issue, it must appear from the affidavit that "there is probable cause to believe that an offense has been committed and that the defendant has committed it. . . ." Fed. R. Crim. P. 4; *Wong Sun v. United States*, 371 U.S. 471, 481 n. 9 (1963).

Applying the *Franks* analysis to § 1983 civil cases involving allegations of false warrant affidavits, the Tenth Circuit Court of Appeals stated,

> If an arrest warrant affidavit contains false statements, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit. Where information has been omitted from an affidavit, [courts] determine the existence of probable cause by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.

*Grubbs*, 445 F.3d at 1278 (quoting *Taylor*, 82 F.3d at 1562).

### A.  Qualified Immunity and the *Franks* analysis

To survive summary judgment, Plaintiffs must show that Officer Baca violated their clearly established Fourth Amendment rights.  If Plaintiffs show that Officer Baca submitted warrant affidavits that contained false statements which were necessary to probable cause, Plaintiffs will have met their burden to show a violation of their Fourth Amendment rights. However, Plaintiffs must overcome the presumption that the warrant affidavits are valid. *Franks*, 438 U.S. at 171.  According to the Supreme Court in *Franks*:

> where the defendant makes a *substantial preliminary showing* that a false statement knowingly and intentionally or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

438 U.S. at 155-56.  To overcome the presumption, in either a criminal or civil case, the person

18

challenging a warrant affidavit must present evidence showing that essential facts in the warrant

affidavit are false.

> [T]he challenger's attack must be more than conclusory and must be supported by more
> than a mere desire to cross-examine. There must be allegations of deliberate falsehood
> or of reckless disregard for the truth, and those allegations must be accompanied by an
> offer of proof. They should point out specifically the portion of the warrant affidavit that
> is claimed to be false; and they should be accompanied by a statement of supporting
> reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be
> furnished, . . . . Finally, if these requirements are met, and if, when material that is the
> subject of the alleged falsity or reckless disregard is set to one side, there remains
> sufficient content in the warrant affidavit to support a finding of probable cause, no
> hearing is required.

*Franks*, 438 U.S. at 171-72 (emphasis added).

Consequently, the Court uses the same analysis as the Court would perform if Plaintiffs

had asked for a *Franks* hearing in determining whether Officer Baca violated Plaintiffs' Fourth

Amendment rights by submitting materially false warrant affidavits. *Grubbs*, 445 F.3d at 1278.

The first step of the *Franks* analysis is to examine each Plaintiff's affidavit testimony to

determine whether the Plaintiff has made a substantial preliminary showing that the essential

facts of Officer Baca's warrant affidavits regarding the Plaintiff are false.  This analysis mirrors

the analysis for summary judgment.  "[O]nce a properly supported summary judgment motion is

made, the opposing party . . . must respond with specific facts showing the existence of a

genuine factual issue to be tried. . . ."  *West v. New Mexico Taxation and Revenue Dept.*, 757 F.

Supp. 2d 1065, 1087 (D. N.M. 2010).  A party may not avoid summary judgment by presenting

conclusory opinions, by reciting allegations unsupported by facts, or by engaging in speculation.

*Id.* (citations omitted).  "In responding to a motion for summary judgment, 'a party cannot rest

on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in

the mere hope that something will turn up at trial.' " *Id.* (citations omitted). *See Morris v.*

*Orman*, 1989 WL 17549, *8 (E.D. Pa. Mar. 1, 1989) (granting summary judgment dismissing a § 1983 claim against warrant affiant noting that plaintiff had presented only bald allegations, assertions and denials).

Rule 56 requires that "[a]n affidavit or declaration . . . must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  And under Rule of Evidence 602, testifying witnesses must "ha[ve] personal knowledge of the matter." Fed. R. Evid. 602.  Under the personal knowledge standard, statements in an affidavit may be disregarded as inadmissible if "'the witness could not have actually perceived or observed that which he testifies to.'" *Argo v. Blue Cross Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citations omitted).  At the summary judgment stage, "statements of mere belief" in an affidavit must be disregarded. *Id.* (citing *Tavery v. United States,* 32 F.3d 1423, 1427 n. 4 (10th Cir. 1994)).

This is the evidentiary framework under which Plaintiffs must meet their "heavy burden" to show that Officer Baca violated their Fourth Amendment rights.  Although the Court must draw inferences from the evidence favorable to Plaintiffs, each Plaintiff must demonstrate that Officer Baca included materially false statements in the warrant affidavits.  If the Plaintiff fails to meet his or her burden, Officer Baca is entitled to qualified immunity on that claim.  *Medina*, 252 F.3d at 1127-28.  "Bare allegations of misrepresentation do not suffice to undermine the presumption of validity accorded an affidavit supporting a warrant request." *Myers v. Morris*, 810 F.2d 1437, 1457-58 (8th Cir. 1987) *abrogated on other grounds*, *Burns v. Reed*, 500 U.S. 478 (1991).  "*A fortiori*, a plaintiff in a civil suit cannot, merely by alleging that information in the affidavit is incorrect, strip an affiant of his qualified immunity." *Jenkins v. Wood*, 1995 WL

106398, *10 (D. Kan. 1995) (quoting *Reed v. Marker*, 762 F. Supp. 2d 652, 655 (W.D. Pa.

1991)).  *See United States v. Moon*, Case No. 11-10223, 2012 WL 2178923, *4 (D. Mass. June

13, 2012) (finding that defendant failed to make substantial preliminary showing that officer's

affidavit in support of a search warrant was false) (unpublished decision).  In *Grubbs*, the Tenth

Circuit Court of Appeals stated, ". . . as a general matter, a suspect's contradiction of a witness'

accusation is not sufficient to vitiate probable cause; otherwise it would be virtually impossible

to secure a warrant for anyone but a confessed offender." 445 F.3d at 1278 (dismissing

plaintiff's malicious prosecution claim against arresting officer who submitted affidavit

describing incident as told by complaining witnesses but denied by accused and finding that

probable cause determination was appropriate).

     In *United States v. Moon*, the defendant sought a *Franks* hearing in an attempt to

suppress evidence found in the search of his residence under a search warrant designed to find

evidence of drug trafficking.  The defendant submitted an affidavit in which he denied that he

sold heroin "to anyone in the Boston area during the 72 hours leading up to and including

February 4, 2011," the date of the search warrant application. *Id.*  The United States District

Court for the District of Massachusetts denied the defendant's request for a *Franks* hearing

because, "Moon's affidavit denying that he sold heroin . . . is the type of 'conclusory, self-

serving statement[]' that courts have repeatedly concluded does not amount to a substantial

preliminary showing warranting a *Franks* hearing." *Id.* at *5 (citing, *United States v. Johnson*,

580 F.3d 666, 671 (7th Cir. 2009); and *United States v. Rosario-Mirando*, 537 F. Supp. 2d 299,

303 (D. P.R. 2008)).

     In *United States v. Southard*, the defendants submitted affidavits in which they denied

making any of the statements attributed to them in the search warrant affidavits. 700 F.2d 1, 10

(1st Cir. 1983).  The First Circuit Court of Appeals affirmed the district court's denial of the
*Franks* hearing and upheld the district court's finding that the defendants failed to make the
requisite "substantial preliminary showing." *Id.* In reaching its conclusion, the First Circuit noted
that "[a]ll of appellants' allegations are conclusory and unsupported by any offer of proof.  By
denying flatly that they even engaged in gambling-related conversations, [the defendants] set up
a swearing contest; either they or [the affiant] are lying." *Id.  See also United States v.
McDonald*, 723 F.2d 1288, 1294 (7th Cir. 1984) (rejecting defendant's self-serving affidavit as
to his whereabouts to refute a warrant affidavit and denying defendant's motion for *Franks*
hearing because defendant failed to make "substantial preliminary showing" that warrant
affidavit was materially false).

　　　　In addition, a plaintiff's affidavit testimony will not be considered if the testimony
contains opinions or speculation not supported by facts.  In *Murray v. City of Sapulpa*, 45 F.3d
1417 (10th Cir. 1995), an employment discrimination case, the plaintiff police officer attempted
to prove by submitting an affidavits from other police officers that the stated reason for the
termination of his employment, improperly disposing of contraband, was a pretext.  *Id.* at 1422.
In affidavits, the police officers stated that it was common practice of Sapulpa, Oklahoma police
officers to destroy all contraband when no charges were to be filed.  *Id.*  The Tenth Circuit Court
of Appeals upheld a ruling disregarding this evidence as "merely conclusory," and affirmed the
summary judgment for defendants because the affidavits "did not provide any factual bases for
the inference that other[] [officers] were treated differently." *Id.  See also Rice v. United States*,
166 F.3d 1088, 1093 (10th Cir. 1999) (stating that plaintiff's affidavit in which he testified that
he believed that the facts in an affidavit by one of defendant's agents were false was insufficient
to create a genuine issue of fact).

22

B. Probable Cause to Arrest Higgins

In Higgins' Affidavit, he generally denies selling drugs and claims he did not engage in cash transactions at his apartment. Under *Franks* and its progeny, the Court cannot consider this denial as sufficient to render Officer Baca's entire account of the undercover operation false. Just as in *Moon*, where the defendant's denial that he sold heroin during the time alleged in the warrant affidavit was insufficient to constitute a substantial preliminary showing required for a *Franks* hearing, Higgins' denial that he sold drugs is insufficient to show that Officer Baca's Warrant Affidavit for Higgins is entirely false. *See Moon*, Case No. 11-10223, 2012 WL 2178923, *4 (D. Mass. June 13, 2012). However, Higgins also testified that due to the physical layout of Apartment #25, the blanket covering the sliding glass door, and the fence around the sliding glass door, Officer Baca could not have witnessed the alleged transactions between the CI and Higgins inside the apartment. Officer Baca's *in camera* testimony that he viewed the transactions through the slats in the fence surrounding the sliding glass door differs from Officer Baca's account in the Warrant Affidavit for Higgins in which Officer Baca did not mention the fence or any kind of obstruction of the sliding glass door. This evidence meets the standard required by *Franks* to show that Officer Baca may have included materially false statements in obtaining the arrest warrant for Higgins.

The next step in the analysis is to disregard Officer Baca's description of his observations of what occurred inside of the apartment and to determine whether the remaining facts in the Warrant Affidavit for Higgins are sufficient to establish probable cause to arrest Higgins. *Franks*, 438 U.S. at 171.

The following facts from Officer Baca's Warrant Affidavit for Higgins remain after the Court sets aside Officer Baca's disputed description of what he saw inside the apartment:

23

a. On March 21, 2010, Officer Baca met with a reliable CI.

b. The CI told Officer Baca that Higgins was selling heroin and pills.

c. Officer Baca and the CI planned a surveyed purchase of heroin.

d. Officer Baca searched the CI, removed all of the CI's possessions, gave the CI money to buy drugs, and instructed the CI to store the money in his baseball cap.

e. Officer Baca observed the CI enter Higgins' apartment, and after a short time, Baca saw the CI exit the apartment with his hands in sight;

f. Officer Baca met the CI, searched the CI, removed a baggie containing a wrapped substance from the CI's possession, determined that the substance tested positive for heroin, and retrieved from the CI the money not used for the drug purchase.

g. On March 22, 2010, Officer Baca again met the CI, who told him that Higgins was selling cocaine and pills.

h. Officer Baca searched the CI, removed all of the CI's possessions, gave the CI money to buy drugs, and instructed the CI to store the money in his baseball cap.

i. Officer Baca observed the CI enter Higgins' apartment and exit the apartment with his hands in sight.

j. Baca met the CI, searched the CI, removed from the CI's possession a baggie containing a white substance, and determined that the substance tested positive for cocaine.

In *United States v. Artez*, 389 F.3d 1106, 1111-12 (10th Cir. 2004), the court described the common formalities observed by police officers when conducting such controlled purchases: "the police search the informant . . . for money and contraband prior to the buy; give the informant money with which to purchase the narcotics; transport the informant to the suspect residence (or follow the informant to the residence); watch the informant enter the suspect residence, disappear while inside the suspect residence, and emerge from the suspect residence; search the informant upon exiting the suspect residence; and receive the narcotics from the informant." *Id.* at 1111-12.  The lack of constant visual of the purchase "does not render a controlled purchase insufficient, nor does the absence of an audio-recording of the transaction." *Id.* at 1112.  Thus, even without witnessing the transaction between the CI and Higgins, Officer Baca had probable cause to arrest Higgins based on the procedure used to perform the controlled purchases.  In sum, Higgins has failed to show that he was arrested without probable cause in

24

violation of his Fourth Amendment rights.  Accordingly, Officer Baca is entitled to qualified

immunity from Higgins' claim under 42 U.S.C. § 1983.

C. Probable Cause to Arrest Urban

In Urban's Affidavit, Urban challenges the veracity of Officer Baca's description of the

controlled purchase on Urban's driveway.  Urban contends as false Officer Baca's testimony that

he moved from the north side of Urban's house to the driveway on the west side of the house,

while Urban was speaking to the CI on his front porch.  Urban claims this testimony could not be

true because Urban would have seen Officer Baca, and would not have engaged in the

transaction with the CI.  Urban also maintains that Officer Baca's testimony about his location

on the west side of Urban's house is false because if Officer Baca was standing on the driveway

a few feet from the truck out of which Urban allegedly retrieved the drugs, Urban would have

seen Officer Baca and would not have sold drugs.  Since Urban would not have sold drugs under

the scenario described by Officer Baca, Urban claims that the entire account in Officer Baca's

Warrant Affidavit for Urban is false.

Urban's affidavit testimony, however, cannot be credited as sufficient because it is based

on presumption and speculation.  Urban presumes that if Officer Baca crossed from one side of

the house to the other side in the manner described, Urban would have seen him in the dark.

Urban speculates that if Officer Baca was "standing literally a few feet" from where Urban's

pick up was located, Urban would have carefully looked around, would have seen Officer Baca,

and would not have conducted the sale.  Urban's affidavit testimony is also speculative.  Urban

did not testify that he saw Officer Baca but just that he would have seen Officer Baca at night in

the positions that Urban thinks Officer Baca would have stationed himself during the alleged

transaction.  These opinions based on speculation are not admissible to prove that the Warrant

Affidavit for Urban was false.  Under the facts asserted in the Warrant Affidavit for Urban, the magistrate clearly had probable cause to issue a warrant for Urban's arrest, and therefore, Officer Baca had probable cause to arrest Urban.  Consequently, Urban has failed to prove a violation of this Fourth Amendment rights, and Officer Baca is entitled to qualified immunity from Urban's claims under 42 U.S.C. § 1983.

D.  Probable Cause to Arrest Garcia

Garcia in her affidavit has presented no evidence disputing the particular undercover transactions described Officer Baca's Warrant Affidavit for Garcia.  Garcia's Affidavit contains only conclusory statements that she never engaged in hand-to-hand drug sales and that she did not take part in a drug sale on May 8, 2010 at her residence.  Similar to Higgins' denials, Garcia's denials are insufficient to overcome the presumption of truthfulness that Officer Baca's Warrant Affidavit for Garcia enjoys under *Franks*.  *See Moon*, Case No. 11-10223, 2012 WL 2178923, *5 (finding a general denial insufficient to warrant a *Franks* hearing).  The Court concludes that Officer Baca had probable cause to arrest Garcia based on the undercover drug sales between the CI and Garcia.  Thus, Officer Baca is entitled to qualified immunity from Garcia's claims under 42 U.S.C. § 1983.

4.  The Count I Claims under the NMTCA

In Count I, Plaintiffs also assert claims under the NMTCA[9] that Baca violated their rights

---

[9] The NMTCA provides,

The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for . . . violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

under Article 2, § 10 of the New Mexico Constitution.[10]  Since the Court will dismiss all of

Plaintiffs' claims brought under 42 U.S.C. § 1983, the Court may decline to exercise its

supplemental jurisdiction over the Count I claims asserted under state law.  *See* 28 U.S.C. §

1367(c)(3) (stating that federal district courts may decline to exercise supplemental jurisdiction

in cases involving federal question jurisdiction when all federal claims have been dismissed).

Accordingly, the Court will decline to exercise supplemental jurisdiction over the state law

claims, and will, in its discretion, remand this case to the Fourth Judicial District Court,

Guadalupe County, New Mexico.  *See Woodberry v. Bruce*, 109 Fed. App'x 370, 373 (10th Cir.

2004) (citing *Gold v. Local 7 United Food and Commercial Workers Union*, 159 F.3d 1307,

1310 (10th Cir. 1998)).

IT IS ORDERED that DEFENDANTS CHARLES BACA'S AND CITY OF SANTA

ROSA'S MOTION TO DISMISS COMPLAINT BASED ON QUALIFIED IMMUNITY AND

AS A MATTER OF LAW BASED ON THE UNDISPUTED MATERIAL FACTS (Doc. No.

39) is granted as follows:

1.  Plaintiff Joseph Higgins' Count I claims under 42 U.S.C. § 1983 will be dismissed

with prejudice.

2.  Plaintiff Jose Urban's Count I claims under 42 U.S.C. § 1983 will be dismissed with

prejudice.

3.  Plaintiff Leslie Garcia's Count I claims under 42 U.S.C. § 1983 will be dismissed with

prejudice.

---

NMSA 1978 § 41-4-12.

[10] "The people shall be secure in their persons, papers, homes and effects from
unreasonable searches and seizures . . ."  N.M. Const. art. II, § 10.

4.  Plaintiffs' Count II and Count III claims will be dismissed with prejudice by stipulation of the parties.

5.  Plaintiffs' state law claims will be remanded to the Fourth Judicial District Court, Guadalupe County, New Mexico.

_____
SENIOR UNITED STATES DISTRICT JUDGE